# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

M-B-W, INC., and BARIKELL S.r.l.,

                  Plaintiffs/Counterdefendants

     v.

MULTIQUIP, INC., and
ALLEN ENGINEERING CORPORATION,

                  Defendants/Counterclaimants

                                        Case No. 07-CV-390

MULTIQUIP, INC., and
ALLEN ENGINEERING CORPORATION,

                  Counterclaimants

     v.

M-B-W, INC. and BARIKELL S.r.l.,

                  Counterdefendants.

## ORDER

This matter comes before the court on a motion for costs and expenses, including attorneys' and experts' fees, which represents the culmination of lengthy patent litigation initiated in 2007. Plaintiff/counterdefendant M-B-W, Inc. ("M-B-W") seeks an award of litigation costs, including attorneys' and experts' fees, pursuant to 35 U.S.C. § 285 and/or the inherent power of the court. M-B-W asserts that it is the "prevailing party" in the underlying patent infringement action with respect to defendant/counterclaimant Allen Engineering's ("Allen") patents-in-suit. M-B-W asks the court to determine that the case is "exceptional," entitling it to attorneys' fees

under the statute.  For the reasons set forth below, the court is obliged to deny M-B-W's request for an award of costs and fees.

## BACKGROUND

### A.    Overview

M-B-W first filed suit in 2007 seeking, among other things, a judgment declaring that certain of its offered products did not infringe a patent owned by defendant Multiquip, Inc. ("Multiquip").   Allen Engineering was allowed to join as a party to the suit on February 27, 2008.  (Docket #29).   On March 5, 2008, Allen asserted counterclaims against M-B-W for patent infringement on three Allen patents-in-suit. (Docket #31).    After all parties filed a Stipulated Joint Motion for Dismissal of Certain Claims and Other Relief (Docket #66), the court entered an Order in January 2009 (Docket #67), finding that M-B-W's accused products do not infringe any of the Allen patents-in-suit, either literally or under the doctrine of equivalents.  This order dismissed all claims and/or counterclaims asserted by Allen and Multiquip concerning the three Allen patents-in-suit.   The court retained jurisdiction to hear the plaintiff's request for an award of costs and expenses, including attorneys' fees.  Over one year later, M-B-W filed the present motion for costs and expenses, including fees.

**B.    The Allen Patents-in-Suit[1]**

At issue in this case are inventions relevant to ride-on power trowels. Ride-on power trowels are used for finishing concrete surfaces.  Each trowel includes an engine to provide motive power for rotating the trowels and maneuvering the machine across the concrete surface. Rotor assemblies supported by the frame rotate and support the trowel.  These rotor assemblies receive motive power from the engine as well.  When the rotor assemblies are tilted about their vertical axes, the trowel moves.  The main subject of recent inventions for these trowels has focused on the development of tilt controls required for moving and steering of the machines.  Early efforts were purely mechanical, but recent inventions have been directed at hydraulic control.

The three Allen patents in this case all employ hydraulic mechanisms to steer the trowel.  These patents include the U.S. Patent No. 5,890,833 (" the '833 patent"), U.S. Patent No. 5,063,660 ("the '660 patent"), and U.S. Patent No. 6,106,193 ("the '193 patent").  The '833 patent discloses a hydraulically steered trowel including such improvements in its claims as an electric-over-hydraulic control[2] circuit and utilization of joysticks to control the valves which move generally with the same hand-lever movements as mechanically steered trowels. Three of the '833 patent's

---

[1]The following information was compiled by reference to the following documents: (Olejniczak Decl. Exs. OO, PP, QQ) (Docket #164-2, 164-5, 164-8); (Olejniczak Decl. Ex. II [Tullis Expert Report] 7-8, 32-36)  (Docket #158); (Def.'s Br. in Opp'n 7-11).

[2]Electric-over-hydraulic is the common term for hydraulic valves activated by electrical controls. (Olejniczak Decl. Ex. II [Tullis Expert Report]) (Docket #158).

ten claims expressly disclose the use of "solenoid valves" and "electric circuit means" for selectively activating the valves. (Olejniczak Decl. Ex. OO) (Docket #164-2). The '660 patent is a continuation in part of the '833 patent. It includes twelve claims that contain express limitations disclosing the use of "electric circuit means" or "electrical circuit means" for activating the hydraulic cylinders. (Olejniczak Decl. Ex. PP) (Docket #164-5). The remaining claims of the '833 and the '660 patents do not contain the above-cited limitations. Lastly, the '193 patent also discloses a hydraulically steered trowel. Each of its seven claims discloses the use of a "hydraulic drive" for powering the trowel's rotors. (Olejniczak Decl. Ex. QQ) (Docket #164-8).

## C.    Case History

Allen served and filed a list of patent claims to be asserted against M-B-W in April of 2008. The asserted claims included: claims 1, 4, and 6 of the '833 patent; claims 1, 2, 6, 7, 12-14, and 16-23 of the '660 patent; and claims 1, 4, 5, and 7 of the '193 patent. (Docket #45). In August 2008, Allen attended an inspection of M-B-W's power trowel. (*See* Solvenson Decl. Ex. A 48) (Docket #176-1) (the date of the inspection is confirmed by the August 5, 2008 time entry on M-B-W's invoice from its counsel). Allen asserts that it was not until this inspection that it learned that the M-B-W trowel did not employ electric-over-hydraulic controls of its hydraulic valves or use hydraulic drives to power the trowel rotors. (Def.'s Br. in Opp'n 9). M-B-W disagrees, arguing that Allen knew or should have known the above information well

before it filed its counterclaims. On October 20, 2008, the defendants served on M-B-W an expert report authored by Allen's Chief Executive Officer, Mr. J. Dewayne Allen ("Mr. Allen"). Mr. Allen's report concludes that M-B-W's product infringed a Multiquip Patent (the '740 patent), all asserted claims of the '833 patent (claims 1, 4, and 6), and claims 1, 6, 13, and 19 of the '660 patent. (Olejniczak Decl. Ex. GG) (Docket #152-4). With respect to the claims of the '660 patent and the '193 patent, Allen argues that Mr. Allen concluded that the accused trowel did not employ hydraulic rotor drives (a key element of the '193 patent), use electric mechanisms to activate the hydraulic valves in the steering systems, use a hydraulic cylinder to alter or control the pitch of the rotor blades, or feature a control valve whereby the trowel operator could alter the flow of hydraulic fluid to adjust the trowel's steering. (Def.'s Br. 10); (Baish Decl. ¶ 6) (Docket #179). M-B-W also served its own expert report as to issues of patent validity on October 20, 2008. In one report, Dr. Charles Garris concluded that all claims of the Allen patents-in-suit must be read to include the electric-over-hydraulic limitation expressly included in some – but not all – of the claims. (Olejniczak Decl. Ex. E 196-203) (Docket #172-5). On November 25, 2008, the parties exchanged rebuttal expert reports. Dr. Paul Tullis issued a report for Allen. Allen asserts that after reviewing Dr. Garris's report, the cited prior art, and the specifications of the Allen patents, Dr. Tullis agreed with Dr. Garris's conclusions that the electric-over-hydraulic limitation should be read into all claims of the '833 and the '660 patents. (Olejniczak Decl. Ex. II ¶¶ 105, 126) (Docket #158); (Def.'s Br.

10-11). On December 19, 2008, the parties filed a stipulation for dismissal of all claims and counterclaims related to the Allen patents-in-suit.

## ANALYSIS

M-B-W asserts it is entitled to costs and expenses, including attorneys' and experts' fees, under 35 U.S.C. § 285 and the inherent power of the court contending that Allen initiated and maintained a frivolous suit, committed inequitable conduct in procuring the Allen patents-in-suit, and committed litigation misconduct, rendering the case "exceptional" under the statute. In response, Allen argues that M-B-W has not met its burden of proof on its entitlement to fees. Allen contends that M-B-W failed to prove Allen's alleged misdeeds by clear and convincing evidence and that M-B-W asks the court to draw all possible inferences in its favor, despite the availability of numerous other and more probable inferences. Allen also argues, in the event the court finds M-B-W entitled to attorneys' fees, that M-B-W seeks a disproportionate amount of attorneys' fees. Therefore, the court will determine whether the case is exceptional and warrants a grant of costs and expenses, including fees, and, if so, the proper amount.

## A.     Exceptional Cases

Parties in the United States traditionally bear their own litigation costs, a practice known as the "American Rule." *Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 655 (7th Cir. 2007). Courts will only order one party to pay another party's attorneys' fees if express statutory authorization exists for such an order of fees.

*Gaffney v. Riverboat Servs.*, 451 F.3d 424, 466 (7th Cir. 2006).  Federal statute 35 U.S.C. § 285 provides for an award of attorneys' fees in patent litigation under particular circumstances.  The statute states that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

In determining whether to award attorneys' fees under § 285, a court follows a two-step analysis resolving:  1) whether the case is exceptional; and 2) if it is, whether an award of attorneys' fees is appropriate. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1370 (Fed. Cir. 2004).  An "exceptional case" may arise from conduct such as willful infringement, inequitable conduct, misconduct during litigation, vexatious or unjustified litigation or the filing of a frivolous suit. *McNeill-PPC, Inc. v. Perrigo Co.*, 337 F.3d 1362, 1371 (Fed. Cir. 2003).

Cases in which an accused patent infringer ultimately prevails, as is the case here, do not automatically constitute "exceptional" cases.  Instead, "exceptional" cases in this context are typically those involving "bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent." *Id.* at 1371-72 (quoting *Cambridge Prods. Ltd. v. Penn Nutrients Inc.*, 962 F.2d 1048, 1050-51 (Fed. Cir. 1992)).  Though a district court has the discretion to award attorneys' fees, these fees should not be routinely assessed against the losing party because a party should not be penalized for merely prosecuting a lawsuit. *Id.* at 1372. In order to establish an exceptional case, the accused infringer must present clear and convincing proof of bad faith conduct on the part of the patent owner.

*Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed. Cir. 1985). An exceptional case finding is not to be based on mere speculation or conjecture. *Innovation Tech., Inc. v. Splash! Medical Devices, LLC*, 528 F.3d 1348, 1351 (Fed. Cir. 2008).

A court may also award fees to a successful party under its inherent equitable power. *See Hall v. Cole*, 412 U.S. 1, 15 (1973). Before a court may exercise its inherent authority to impose sanctions, there must be "a finding of fraud or bad faith whereby the very temple of justice has been defiled." *See Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994). A court's inherent authority is in addition to authority provided by statute or rule. *See id.* M-B-W requests that the court designate this an exceptional case that warrants an award of costs and expenses, including attorneys' and experts' fees. Alternatively, M-B-W requests the court use its inherent powers to sanction Allen. The court will address each of M-B-W's arguments in turn.

## B. Initiation and Maintenance of a Frivolous Lawsuit

M-B-W first asserts that its case is exceptional and warrants an award of attorneys' fees because Allen submitted its "frivolous patent infringement claims in subjective bad faith, and its claims were objectively baseless." (Pl.'s Mem. in Supp. of Mot. for Costs and Expenses 4). A frivolous infringement suit is one which the defendant knew, or upon reasonable investigation, should have known was baseless. *Haynes Int'l Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed.Cir.1993)

(citing *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 810-11 (Fed.Cir. 1990)).

Courts assessing whether an infringement claim is frivolous have used the above analysis, but have also framed the issue by asking whether the infringement suit was brought in subjective bad faith and whether the litigation was objectively baseless. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1382 (Fed. Cir. 2005) (citing *Professional Real Estate Investors v. Columbia Pictures Industries*, 508 U.S. 49, 60-61 (1993)); *see also Forest Labs Inc. v. Abbot Labs,* 339 F.3d 1324, 1329-31 (Fed. Cir. 2003).[3] For a suit to be considered objectively baseless, it must be one in which "no reasonable litigant could realistically expect success on the merits." *Dominant Semiconductors SDN.BHD. v. Osram GMBH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (quoting *Professional Real Estate Investors*, 508 U.S. at 60)). In some circumstances, proof of objective baselessness will be deemed sufficient proof of subjective bad faith. *Eltech Systems Corp.,* 903 F.2d at 810.

M-B-W claims Allen knew or should have known there was no infringement of its patents, yet proceeded with this infringement action nevertheless. To prove that Allen knew its infringement claims were baseless, M-B-W focuses on the

---

[3] To the court's knowledge, this analysis has never been labeled a "frivolousness" analysis, but rather, it has been applied in cases where there has been no litigation misconduct or inequitable conduct in securing the patent. *Brooks Furniture Mfg., Inc.* 393 F.3d at 1382 (noting that "[a]bsent misconduct in conduct of the litigation or in securing the patent, sanctions may be imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless"). However, the frivolous infringement suit inquiry – asking whether the patentee knew or should have known its suit was baseless – appears similar, if not identical to, the subjective bad faith/objectively baseless examination. Accordingly, the court will conduct its analysis of whether Allen frivolously initiated and maintained the lawsuit with these similarities in mind.

knowledge of Mr. Allen (Allen's technical expert, an inventor of certain of Allen's patents, and Allen's CEO). M-B-W first claims that Mr. Allen "admitted to the frivolity of Allen's claims/counterclaims" by admitting three things: (1) that the three Allen patents-in-suit are limited to power steering control systems of the electric-over-hydraulic type; (2) that the accused M-B-W trowels do not infringe the Allen patents because the trowels do not provide such electric-over-hydraulic control; and (3) that Attorney Frank Dykas ("Dykas") had advised Allen on June 8, 2000, that a hydraulic-over-hydraulic steering control would not infringe two of Allen's patents-in-suit. (Pl.'s Mem. 3-4). M-B-W also asserts that Mr. Allen personally reviewed the M-B-W parts manual in 2007, well before it filed counterclaims against M-B-W in this action, and determined that the accused trowels did not employ any electric circuit to affect steering. (Pl.'s Mem. 6). Consequently, M-B-W argues that Mr. Allen's admissions and his review of the parts manual demonstrate that Allen knew that M-B-W's trowels did not infringe Allen's patents.

The court cannot agree that the above-cited evidence provides clear and convincing proof that Allen knew or should have known its patent infringement claims against M-B-W were baseless. First, Mr. Allen's acknowledgment that the patents-in-suit were limited to power steering of the electric-over-hydraulic type and that M-B-W did not infringe these patents, occurred during a deposition on December 16, 2008 – a mere three days before the parties filed a stipulation for dismissal of all claims

and counterclaims related to the Allen patents. (Pl.'s Mem. 4).[4] The deposition also occurred nine months after Allen's counterclaims were initially filed, as well as after Mr. Allen had an opportunity to inspect the accused trowel, and after Mr. Allen had the benefit of considering the opinion of Allen Engineering's other expert, Dr. Tullis. Based on the timing of the testimony, the court does not appreciate, and indeed M-B-W gives no adequate explanation – other than citing to the transcript of the deposition – how this evidence supports a finding that Allen knew or should have known when it joined the suit that its patent infringement claims were baseless. Furthermore, M-B-W cannot use the deposition testimony to prove that Allen *continued* its lawsuit in bad faith because the timing of the deposition testimony negates such an argument. Mr. Allen's admittance of non-infringement did not occur early in the proceedings, but rather three days before the parties agreed to end the lawsuit.

M-B-W further asserts that Mr. Allen admitted to the frivolity of the claims because his deposition comments acknowledged that an August 8, 2007 letter sent by Allen's counsel to M-B-W's counsel referred to the Allen patents-in-suit. The letter mentioned that "Allen Engineering holds numerous patents on power steering control systems, for ride-on power trowels, of the electric over hydraulic type." (Olejniczak Decl. Ex. Q) (Docket #164-7). M-B-W contends that Mr. Allen's acknowledgment that the letter refers to the Allen patents-in-suit proves that Allen

---

[4] The deposition was also taken only to question Mr. Allen regarding his role as Allen's expert, not his role as an agent of Allen Engineering. (Docket #172-16)

knew its patents were limited to the electric-over-hydraulic type. This allegation is significant because the crux of M-B-W's frivolousness argument is that Allen purposefully read certain of its patent claims too broadly in its accusations of infringement. Specifically, M-B-W argues that Allen knew or should have known the electric-over-hydraulic limitation should have been read into every one of Allen's asserted claims. Yet, the record indicates that Allen was confused over which of its patent's claims were limited to electric-over-hydraulic steering mechanisms because not all of the claims contained express limitations disclosing the use of electric circuit means. (Def.'s Br. 7). Mr. Allen's expert report reflects some of this confusion. (*See* Docket #152-4). M-B-W presents the court with no evidence rebutting a finding of honest and reasonable confusion over how broad to read the claims of the Allen patents-in-suit. Because the confusion appears to have been honest and not patently unreasonable, the court refuses to find that Mr. Allen's testimony referencing the letter and the patents-in-suit is conclusive proof that Allen initiated the lawsuit even though it knew or should have known its patents were wholly limited to the electric-over-hydraulic type.

Furthermore, the letter and Mr. Allen's testimony also lack persuasiveness because M-B-W's arguments in this regard assume that Allen knew or should have known M-B-W's patents were limited to the hydraulic-over-hydraulic type. Yet, M-B-W cites to no evidence suggesting any such knowledge on Allen's part. Thus, absent evidence of Allen's knowledge regarding M-B-W's patents or evidence

rebutting what appears to be an honest and reasonable confusion over the correct scope of certain claims in the patents-in-suit, the court refuses to make a finding of subjective bad faith or objectively baseless litigation.

M-B-W also points to an August 8, 2000 letter that Attorney Dykas authored to support its argument that Allen had knowledge of non-infringement prior to initiation of the lawsuit. The letter discussed the Allen '833 and '660 patents (Olejniczak Decl. Ex. E) (Docket #151-6). M-B-W claims that in this letter, Allen was advised by Dykas – M-B-W refers to Dykas as Allen's trial attorney – that Allen's patents were limited to electric-over-hydraulic steering. (Pl.'s Mem. 7). Next, M-B-W cites Mr. Allen's deposition testimony admitting that Mr. Dykas' letter represented that hydraulic-over-hydraulic control of a Multiquip patent would not infringe Allen's '660 patent. Accordingly, M-B-W urges the court to infer that this evidence demonstrates Allen's knowledge that M-B-W's patents did not infringe Allen's '833 and '660 patents. Yet, this argument is flawed in many respects.

First, M-B-W's categorization of Dykas as Allen's trial attorney is misleading. When this letter was received by Allen, Dykas represented Multiquip in a developing dispute against Allen. (Olejniczak Decl. Ex. E) (Docket #151-6).[5] Next, Dykas' 2000 letter is insufficient as proof of bad faith because the comments were made more than seven years before the current suit was filed and were made while Dykas represented a party with interests directly adverse to Allen. The letter, read in full,

---

[5] M-B-W did eventually alert the court, in a footnote in its Reply Brief, to the critical fact that Attorney Dykas represented Multiquip at the time this letter was sent.

appears to advance Multiquip's potential litigation position if the dispute were to progress. Furthermore, the court is unsure how this letter demonstrates Allen knew or should have known M-B-W's patents were limited to the hydraulic-over-hydraulic type. The letter only advises Allen that Multiquip's patents are of the hydraulic-over-hydraulic type as well as asserts that Allen's are not. The letter provides no proof of whether Allen knew M-B-W's patents were limited to the hydraulic-over-hydraulic type or actually understood, itself, that its patents were limited to electric-over-hydraulic steering systems.

The court is also unconvinced that Mr. Allen's review of M-B-W's parts manual occurred before Allen filed its counterclaims against M-B-W. Though M-B-W claims Mr. Allen reviewed the manual in 2007, the record is unclear on this point.[6] It appears that Allen repeatedly stated he could not remember when he reviewed the manual – including whether he did so before Allen filed its counterclaims. (Def. Br. 19); (Olejniczak Decl. Ex. P) (Docket #172-16). It is evident that he reviewed the manual in preparing his expert report because his report references the manual. (Olejniczak Decl. Ex. GG) (Docket #152-4). However, the report was issued on October 20, 2008, only two months before the parties stipulated to the dismissal of

<hr/>

[6] M-B-W cites to Mr. Allen's December 16, 2008 deposition testimony to support its contention that the review of the manual took place in 2007. However, the deposition testimony does not clearly demonstrate that Mr. Allen reviewed the manual in 2007. M-B-W asked Mr. Allen whether he reviewed the parts manual subsequent to the World of Concrete show in 2007. Mr. Allen first states he cannot remember; then he states the review of the manual occurred "later that year." (Olejniczak Decl. Ex. P [Allen Dep.]) (Docket #172-16 14-15). However, later in the deposition testimony, Mr. Allen again states he cannot remember whether he reviewed the parts manual between the World of Concrete show in February of 2007 and the filing of Allen's counterclaims in March of 2008. (*Id.* at 41).

all claims.  Thus, all that is clear from this evidence is that Mr. Allen reviewed the parts manual some time before October 20, 2008.  As such, the argument set forth by M-B-W pertaining to this evidence is not convincing proof of subjective bad faith.

M-B-W also argues that Allen's pre-litigation tactics directly prove that it asserted the patents in bad faith.  M-B-W contends that Allen used these tactics as an anti-competitive weapon – an attempt to use governmental process to interfere with the business relationships of its competitor. (Pl.'s Mem. 9). M-B-W states "in light of the fact that Allen knew that [M-B-W's] system does not infringe its patents," an August 8, 2007 "cease and desist letter" demanding that M-B-W cease importing the infringing trowels lest it face "complicated and therefore expensive litigation" was in bad faith.  (Pl.'s Mem. 9); (Olejniczak Decl. Ex. Q) (Docket #164-7).  The court first notes that M-B-W's argument assumes Allen had knowledge of non-infringement at the time it sent this letter. Because M-B-W has failed, thus far, to conclusively prove Allen knew or should have known its infringement claims were baseless, the court finds this argument unavailing.  Even so, M-B-W's use of this letter to cast doubt on Allen's good faith fails in other respects as well.   A full reading of the letter demonstrates it was written in response to a letter from M-B-W outlining its position of non-infringement.   In it, Allen's attorney warns the plaintiffs of the defendants' litigation position.  Typically, letters of this nature do not support a finding of bad faith. *See  Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1315 (Fed. Cir. 2010). Furthermore, the response letter from Allen was written after M-B-W filed

its complaint against Multiquip in this court, though before the complaint was served on the defendant. Thus, M-B-W, and not Allen, had already taken the necessary steps to initiate a lawsuit. As such, the court finds that the letter is in no way indicative of Allen's bad faith.

To demonstrate Allen's subjective bad faith, M-B-W also cites to a phone conversation between M-B-W's attorney (Jochman) and Allen's attorney (Dykas) on or about August 22, 2007, in which Dykas allegedly stated that M-B-W's accused trowel did not infringe Allen's patent and that he would confirm this in writing. (Pl.'s Mem. 9). As proof, M-B-W offers a letter from Jochman to Dykas stating, "I look forward to receiving your confirmation that [M-B-W's] trowel does not infringe any Allen Engineering patents." (Olejniczak Decl. Ex. S) (Docket #165-2). M-B-W also offers as proof a letter from another of its attorneys (George H. Solvenson) to Dykas stating that in the phone conversation with Jochman, Dykas admitted non-infringement. (Olejniczak Decl. Ex. T 3) (Docket #165-4). On the other hand, Dykas' deposition testimony reveals a different version of the facts. Regarding the letters, Dykas testified, "I told Mr. Jochman . . . we didn't have any issues at that time with the Allen patents." (Olejniczak Decl. Ex. K [Dykas Dep. 99:19-25]) (Docket #172-11). M-B-W counters this deposition testimony by arguing that approximately two weeks before the phone conversation took place, Mr. Allen entered into a Joint Defense Agreement (Docket #131) where Allen agreed to assert the three Allen patents-in-suit against M-B-W. Therefore, M-B-W reasons Allen filed its counterclaims in bad

faith. The court cannot agree with M-B-W. The record is unclear as to whether Dykas acknowledged M-B-W's non-infringement in the August phone conversation. As best as the court can discern from the record, a mis-communication occurred between the parties over whether Allen and Multiquip would be asserting infringement of the three Allen patents against M-B-W. M-B-W also argues that further evidence of Allen's bad faith lies in its refusal to have a meeting with M-B-W and its counsel to minimize litigation expense and to avoid unnecessary burden on the court. (Pl.'s Reply Mem. 10). It appears from the record, however, that Allen did not affirmatively refuse to such a meeting, but merely failed to respond to requests for one. (Docket #172-11). Without more, the court is unable to find Allen's failure to respond to requests for early settlement meetings as evidence of bad faith.

M-B-W also argues that Allen's pre-filing investigation was so inadequate as to demonstrate its subjective bad faith and its objectively baseless assertions of infringement. M-B-W states that Allen's Opposition Brief admitted to the defendant's failure to conduct a sufficient infringement inquiry before filing its counterclaims. It does appear that Allen relied predominantly upon Mr. Allen's observations of M-B-W's trowel at the 2007 World of Concrete trade show in assessing infringement before filing its counterclaims. (Def.'s Br. in Opp'n 14). According to the record, Mr. Allen saw the trowel "from the aisle in the booth" at a distance of ten to fifteen feet and, from that vantage point, could not tell whether the trowel used electric circuits to actuate the hydraulic valves. (Olejniczak Decl. Ex. P [Allen Dep. II at 8:2-16, 11:5-

11, 9:21-10:1]) (Docket 172-16). While he assumed the M-B-W trowel used a mechanical drive to power the rotors, he could not be certain from "where [he] was standing." (Id. at 19:10-15). Yet, based on his observations of the trowel, Allen testified that he concluded "there would be some claims that in our patents would probably read on that trowel." (Id. at 13:18-20). In its Opposition Brief, Allen explains that shortly after the trade show, on March 26, 2007, M-B-W informed Allen that it had imported only three trowels, one used at the trade show, and two that were used for testing and sent back to Italy. (Def.'s Br. in Opp'n 14) (referencing Docket #161-4). Therefore, Allen argues it was unable to perform a proper inspection before M-B-W filed suit against Multiquip. M-B-W claims that Allen did have an opportunity to investigate an accused trowel in May of 2007. (Pl.'s Reply Mem. 9). Upon a review of the record, it appears that an accused M-B-W trowel was placed on consignment with United Rental located in Louisville, Kentucky, on or about May of 2007. It also appears that an Allen employee sent an email informing Mr. Allen of the trowel along with pictures. (Olejniczak Decl. Ex. O) (Docket #164-1). However, the email does not describe which trowel was available for inspection and it does not indicate that the employee actually made an inspection of the machine other than to take pictures. Id. Nevertheless, evidence of a pre-filing inspection of an accused trowel seems to negate, rather than supplement, M-B-W's argument that Allen failed to conduct an adequate pre-filing investigation. Although the court is troubled by the lack of thoroughness in Allen's pre-filing infringement investigation, the court

concludes there is not sufficient evidence that the investigation was so lacking in good faith as to warrant a finding of subjective bad faith or so unreasonable as to render Allen's claims objectively baseless. Consequently, the court does not find this case necessitates a designation of an "exceptional case" or an award of attorneys' fees based on a claim of frivolous initiation and maintenance of an infringement lawsuit.

## C.     Inequitable Conduct in Obtaining Patents-in-Suit

M-B-W next argues it is entitled to litigation costs and fees because Allen engaged in inequitable conduct. To successfully prove inequitable conduct, the accused infringer must present clear and convincing evidence that the patent applicant:  (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information; and (2) intended to deceive the Patent and Trademark Office (PTO). *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313 (Fed. Cir. 2008); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008). Only once the threshold findings of materiality and intent are established may the court then balance whether the material misrepresentations or omissions are sufficiently significant in light of the evidence of intent to warrant the consequence of an inequitable conduct finding. *Board of Education v. American Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed. Cir. 2003). Thus, the lower the materiality of the omitted or misrepresented reference,

the higher the showing of intent need be and vice-versa. *See Duro-Last, Inc. v. Custom Seal, Inc.,* 321 F.3d 1098, 1110 (Fed. Cir. 2003).

M-B-W argues Allen made affirmative misrepresentations of material fact and failed to disclose material information, as well as intended to deceive the PTO, thereby entitling M-B-W to an exceptional case designation. (Pl.'s Mem. 10). Specifically, M-B-W contends that Allen, with the intent to deceive, did not disclose to the PTO a *highly material* 1959 patent issued to John M. Mincher for a "Floating and Troweling Machine" (the "Mincher Patent"). Allen admits that the Mincher Patent is *material*, but only minimally so. (Def.'s Br. 25). Regardless, Allen asserts that M-B-W has failed to present any conclusive evidence that Allen withheld the Mincher Patent reference with the intent to deceive the PTO. Alternatively, Allen argues that because the withheld prior art reference in this case is of low materiality, M-B-W must prove a higher level of intent to deceive. (Def.'s Br. 24).

### 1.    Materiality

For many years, courts have held "that materiality for purposes of an inequitable conduct determination require[s] a showing that 'a reasonable examiner would have considered such prior art important in deciding whether to allow the patent application.'" *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed.Cir.2003) (quoting *Driscoll v. Cebalo*, 731 F.2d 878, 884 (Fed.Cir.1984)). This standard was based in part on the definition of materiality articulated in the PTO's Rule 56. *See* 37 C.F.R. § 1.56(a) (1991). However, in 1992, the PTO

amended Rule 56, creating what appears to be a narrower standard. The new version of Rule 56 defines material information as follows:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>    (i) Opposing an argument of unpatentability relied on by the Office; or
> (ii) Asserting an argument of patentability,

37 C.F.R. § 1.56(b) (1992). Rule 56 further specifies that:

> A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of the evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56 (1992). In *Digital Control Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1314-16 (Fed. Cir. 2006), the Federal Circuit clarified that the new standard under Rule 56 does not supplant the older "reasonable examiner" standard. Rather, the new rule is simply an additional test of materiality. Therefore, if a withheld reference is material under Rule 56, it is material. If the withheld reference is material under the "reasonable examiner" standard, it is also material. *See Digital Control*, 437 F.3d at 1316. To the extent that the "reasonable examiner" test requires a higher showing of materiality than the Rule 56 standard, "the requisite finding of intent may be lower." *Id.*

Additionally, the analysis of materiality should not occur in a vacuum. Instead, materiality should be judged based on "the overall degree of similarity between the omitted reference and the claimed invention in light of the prior art before the examiner." *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1328 (Fed.Cir.1998). A showing of substantial similarity is sufficient, but not necessary for a showing of materiality. *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 919 (Fed. Cir. 2007).

M-B-W argues that the Mincher Patent was highly material to the examination of the applications leading to the Allen '833, '660 and '193 patents-in-suit because none of the prior art references before the PTO in these patents contained any disclosure of "hydraulically steered riding trowels." (Pl.'s Mem. 12). Accordingly, M-B-W contends that the Mincher Patent is highly material because it constitutes non-cumulative prior art that a reasonable examiner would have considered important in deciding whether to allow the applications to issue as patents. (Pl.'s Mem. 12). Allen also admits to the Mincher Patent's materiality. However, Allen contends that its materiality is low. Allen reasons that, as a technical matter, the Mincher Patent is material only because it meets the definition provided for in the PTO rules.

The court agrees that the Mincher Patent meets the definition for materiality as set out in 37 C.F.R. § 1.56. First, the Mincher patent discloses a hydraulically steered trowel. (Olejniczak Decl. Ex. II [Tullis Expert Report ¶ 29]) (Docket #158).

Second, in prosecuting its '833 patent, Allen's attorney Stephen Carver ("Carver") represented to the PTO that there was "no known prior art hydraulically steered riding trowel." (Docket #159-1 208).[7] This statement appears to have been made in an effort to overcome the PTO's objections to certain of the '833 patent claims. (Docket #159-1 207-10).[8] Thus, the Mincher Patent meets the Rule 56 definition of materiality because its disclosure of a hydraulically steered riding trowel constitutes non-cumulative information that is inconsistent with arguments made by Allen's attorney in support of the '883 patent's patentability. *See* 37 C.F.R. § 1.56.[9] Accordingly, it is evident that Allen meets the first prong of the inequitable conduct test because it made an affirmative misrepresentation of material fact and failed to disclose material information to the PTO.

However, Allen argues that beyond meeting the technical definition of materiality, the Mincher Patent has "virtually no materiality." (Def.'s Br. 27). This is significant, Allen asserts, because the low materiality of the withheld reference requires a higher showing of intent by M-B-W. (Def.'s Br. 24). Allen supports its

---

[7] Carver made this statement in his written response to the PTO Examiner's rejection of certain of the '833 patent's claims. Carver also made three other similar statements in his response.

[8] Carver made these statements in response to an Office Action rejecting certain claims of the '833 patent as obvious based on patents related to bulldozers, steam shovels, and boat propellers. (Olejniczak Decl. Ex. II [Tullis Expert Report ¶109]) (Docket #158); (Olejniczak Decl. Ex. KK 207-10) (Docket #159-1).

[9] Carver did not make such affirmative misrepresentations when prosecuting the '660 and '193 patents. However, these patent applications did not disclose the Mincher Patent. Therefore, the Mincher Patent meets the Rule 56 materiality definition with regard to the '660 and '193 patents as well.

argument by pointing to all the differences between its patents and the Mincher Patent. (Def.'s Br. 25). Conversely, M-B-W asserts that the withheld Mincher Patent reference is of high materiality because: 1) none of the prior art references before the PTO in the Allen '833, '660 and '193 patents contained disclosure of hydraulically steered riding trowels; and 2) the PTO only decided to issue the '833 patent after Carver misrepresented that no known prior art existed for hydraulically steered riding trowels. (Pl.'s Mem. 12, 15). Though the Mincher Patent and the Allen patents-in-suit are different in many respects, the court agrees with M-B-W that Allen's misrepresentation likely affected, at least to some degree, the PTO's decision to issue the '833 patent. Furthermore, the omission of any reference to Mincher in the prosecutions of the '660 and the '193 patents also likely affected the PTO's patentability decisions. First, the record reflects that no prior art references before the PTO in the Allen '833, '660 and '193 patents contained disclosure of hydraulically steered riding trowels. (Olejniczak Decl. Exs. KK, MM, NN) (Docket #159-1, 161-2, 162-1). Second, the record indicates that in his response to the PTO's Office Action rejecting certain of the '833 claims, Carver argued that the patents relied upon by the Examiner were impermissible non-analogous art because they were completely unrelated to riding trowel technology. (Olejniczak Decl. Ex. KK 207-10) (Docket #159-1). After considering this response, the PTO decided to issue the patent. *Id.* Because the PTO was at first concerned about prior art in the form of hydraulically steered bulldozers, it follows that the PTO would have also been concerned about

a hydraulic steering system in a riding trowel. Even if the Examiner would still have issued the patent with knowledge of the Mincher prior art, this does not prohibit a finding of materiality because the "reasonable examiner" standard does not require the misstatement or omission to render an invention unpatentable to be material. *See, e.g., Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1237-38 (Fed.Cir.2003) (withheld reference was material notwithstanding patent examiner's determination that it did not render the invention unpatentable). Therefore, the court finds that a reasonable examiner would have considered the Mincher Patent to be important in a determination of patentability as to all the Allen patents-in-suit.

Though the court finds that the withheld Mincher reference meets the "reasonable examiner" test of materiality as well as the Rule 56 definition, the court is unwilling to categorize the Mincher Patent as highly *or* minimally material. M-B-W has failed to convince the court that the withheld reference was of such high materiality to warrant a lower showing of intent to deceive. Likewise, it does not appear that the Mincher Patent was of such minimal materiality as to heighten the requisite showing of intent. Thus, the court finds it appropriate to require a showing of intent commensurate with the showing of materiality.

### 2.    Intent to Deceive

A showing of materiality alone does not give rise to a presumption of intent to deceive. *Praxair Inc.,* 543 F.3d at 1313. The intent element of inequitable conduct

is "in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380,1385 (Fed.Cir. 1998). Intent to deceive cannot be inferred simply from the decision to withhold information where the reasons given for the withholding are plausible. *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed.Cir.2003). In addition, "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988) (en banc in relevant part).

"An inference of intent to deceive is generally appropriate, however, when (1) highly material information is withheld; (2) 'the applicant knew of the information [and] ... knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding.'" *Praxair Inc.*, 543 F.3d at 1313 (quoting *Ferring B.V. v. Barr Labs., Inc.,* 437 F.3d 1181, 1191 (Fed.Cir.2006).

M-B-W asserts that Allen: 1) knew of the Mincher Patent's disclosure of a hydraulically steered trowel; 2) knew or should have known it was highly material

prior art; and 3) has not provided a credible explanation for the withholding.[10] Accordingly, M-B-W asks the court to infer that Allen intended to deceive the PTO regarding Allen's misrepresentation and withholding of material information. To support its argument for an inference of deceptive intent, M-B-W lists three prior instances when Attorney Carver cited the Mincher Patent to the PTO in his prosecution of other Allen patents. M-B-W reasons that because Carver had knowledge of the Mincher Patent when applying for previous Allen patents, an inference should be drawn that he had knowledge (or should have had knowledge) of the materiality of the Mincher Patent to the current patents-in-suit.[11]

While certainly Carver's references to the Mincher Patent when prosecuting Allen patents' '220, '510 and '938 prove Carver had knowledge of the Mincher Patent's existence, the court is unconvinced that such knowledge necessarily leads to an inference that Carver knew or should have known of the Mincher Patent's *materiality* to the Allen patents-in-suit. First, the circumstances under which Carver cited Mincher to the PTO do not suggest, on their own, that Allen knew of Mincher's materiality to the current Allen patents-in-suit, nor do they suggest that Carver made a deliberate decision to withhold a known material reference or to make a knowingly

---

[10] The court did not determine that the withheld Mincher reference was of high materiality, therefore, the test M-B-W asks us to apply to make an inference of deceptive intent cannot be applied in its entirety because the first prong – high materiality – has not been met. Nonetheless, the court will still analyze whether the other two prongs of the inference test are met as well as examine all other relevant facts in making an intent determination.

[11] The court recognizes that the knowledge and actions of an applicant's attorney are chargeable to the applicant. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987).

false misrepresentation when prosecuting the '833, the '660 or the '193 patents. Indeed, "the mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1331 (Fed. Cir. 2009). Further refuting M-B-W's position is the fact that Carver's prior references to the Mincher Patent had nothing to do with hydraulic steering. Thus, Carver would have had no reason to look for hydraulic systems during the three prosecutions in which Mincher was cited. In fact, M-B-W cites to no evidence that confirms or even suggests that Carver ever understood the Mincher Patent to disclose hydraulic steering. For instance, in prosecuting the Allen '220 patent in 1990,[12] Carver listed Mincher as disclosing a riding trowel. (Olejniczak Decl. Ex. H [Carver Dep. 198:19 – 199:9]) (Docket #172-8); (Olejniczak Decl. Ex. ZZ 2) (Docket #166-8). In that same year, Carver filed an application for a design patent (Allen '510 patent) on an Allen trowel which showed a manually steered machine and listed Mincher on a prior art statement, as well as submitted a copy of Mincher to the PTO. (Olejniczak Decl. Ex. YY 2) (Docket #166-6). Lastly, in filing for the '938 patent in 1997, Carver listed Mincher again in the "Notices of References Cited" as well as submitted a copy of the Mincher Patent to the PTO. (Olejniczak Decl. Ex. MMM) (Docket #161-3). In an Office Action related to the '938 patent, the PTO

_____

[12] The '220 patent comprised an improvement to manually steered (not hydraulic) power trowels. (Olejniczak Decl. Ex. H [Carver Dep. 198:19 – 199:9]) (Docket #172-8)

stated that Mincher discloses a riding trowel with a hood assembly covering a motor. (Docket #160-3).  Thus, none of the prior listings reference hydraulic steering, and M-B-W cites to no further evidence that would allow the court to infer, based on the prior references, that Carver was aware or should have been aware that Mincher disclosed hydraulic steering.  Accordingly, the court refuses to draw a permissive inference of deceptive intent with regard to the Allen patents-in-suit based on the argument that Carver previously cited Mincher in prosecuting other Allen patents.[13]

M-B-W concludes its argument for an inference of deceptive intent by asserting that Allen has failed to provide a credible explanation for its withholding of the Mincher Patent. M-B-W points to the deposition testimony of both Attorney Carver and Mr. Allen to demonstrate the lack of a satisfactory excuse. M-B-W characterizes Carver's explanations for not disclosing the Mincher patent as "preposterous" and "frivolous." (Pl.'s Mem. 17). Yet, this court finds that the deposition testimony of both Carver and Mr. Allen, if believed, demonstrate that neither understood that Mincher, at the time the Allen patents-in-suit were prosecuted, disclosed material prior art.  When first asked why Carver did not cite Mincher during the prosecution of the '833 patent, Carver responded that he "didn't think it was relevant at the time." (Carver Dep. 191:23 – 192:2) (Docket #172-8).

---

[13] Throughout its deceptive intent argument, M-B-W repeatedly contends that because Allen knew of the Mincher Patent in its prosecution of prior Allen patents, it also knew of the materiality of the Mincher Patent to the Allen patents-in-suit. Yet, as the court previously noted, without more evidence, whether direct, indirect, or circumstantial, the court refuses to draw an inference of deceptive intent.

Later, when asked whether he made a decision not to disclose Mincher with respect to the '833 patent, Carver stated, "No, I didn't make that conscious decision. I don't recall reviewing them. And I don't really remember what happened. But I thought I did disclose the best art there was." (Carver Dep. 193:3 – 193:8) (Docket #172-8). Thus, it appears that Carver does not specifically recall reviewing the Mincher Patent in his prosecution of the '833 patent. If he did review it, Carver likely did not cite it as prior art because he did not find it relevant. His testimony, if found credible, also indicates that he did not deliberately decide to make misrepresentations or avoid disclosure of the Mincher Patent before the PTO.

M-B-W argues that Carver's testimony is speculative and has been tendered only about the conclusions Carver *must have drawn* at the time, not what conclusions he actually did make. *See McKesson*, 487 F.3d at 918. Therefore, M-B-W urges the court to find that Carver's excuses lack credibility. Although Carver's testimony does speculate on what he must have concluded about the Mincher Patent's materiality at the time he prosecuted the Allen patents-in-suit, Carver also walks through exactly how he searched for prior art and examined other patents at that time. He explained that he only conducted manual searches when the Allen patents-in-suit were being prosecuted; that his manual searches mainly included examination of drawings; that when drawings did not appear similar to him, he rejected them as insignificant; that the Mincher drawings and the drawings of the Allen patents-in-suit lacked any significant resemblance; and that he, therefore, likely

dismissed the Mincher Patent as irrelevant to his prosecution of the Allen patents-in-suit. (Carver Dep. 195:13 – 197:24). Furthermore, with regard to his examination of the Mincher Patent and its pertinence to the '833 patent, Carver testified: "I don't think these drawings look even close to what we are trying to patent" and "that does not look like a hydraulic trowel to me." (Carver Dep. 196:4 – 197:5). In explaining why he may not have reviewed Mincher in any detail or found it germane to the Allen patents-in-suit, Carver repeatedly commented that any average searcher "would pass right over [Mincher], because that does not look like a hydraulic trowel to me." (Carver Dep. 196:5 – 197:5). Carver further stated that he has prosecuted over 2,000 patents in his career, which involved reviewing over 20,000 patents. (Carver Dep. 202:23 – 203:6). He explained that "nobody's ever indicated, legally or otherwise, that I'm under any obligation to memorize all of [the patents he has previously cited]." (Carver Dep. 203:1 – 203:3). Though at times speculative, Carver's explanation for non-disclosure appears both credible and plausible. Moreover, even if Carver's method for determining whether to disclose the Mincher Patent as prior art was considered grossly negligent, the court would still not be justified in inferring intent to deceive because Carver's conduct, viewed in light of all the evidence, including evidence indicative of good faith, does not "indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants,* 863 F.2d at 876.

M-B-W further attempts to discredit Carver's explanations by arguing that Carver justified non-disclosure because he thought the Mincher Patent was invalid for lack of enablement or inoperativeness, even though, as M-B-W asserts, a reference need not be enabled to qualify as prior art for obviousness. *Therasense, Inc. v. Becton, Dickinson and Company,* 593 F.3d 1289, 1297 (Fed. Cir. 2010). Carver admittedly stated that he did not think Mincher was an "enabling disclosure" or a "valid patent." (Carver Dep. 198:4). Yet, he made these comments while explaining his confusion over the correctness of the Mincher Patent's drawing as related to its written description. Carver never testified that he chose not to cite the Mincher Patent as prior art because he viewed the Mincher Patent as inoperable or invalid. Thus, the court rejects M-B-W's arguments in this regard.

Furthermore, the court also rejects M-B-W's reliance on Mr. Allen's testimony in its attempt to show Allen has no good faith excuse for withholding the Mincher reference from the PTO. Mr. Allen's testimony regarding his opinions of the Mincher Patent was taken after he was asked to review the patent for purposes of his deposition occurring on July 30, 2008. Indeed, Mr. Allen's testimony demonstrates that he had no knowledge of the Mincher Patent before he was asked to review it by M-B-W for the deposition. (Olejniczak Decl. Ex. I [Allen Dep. 144:18 – 151:3]) (Docket #172-9). Therefore, Mr. Allen could not have had any intent to deceive the PTO when the Allen patents-in-suit were prosecuted. Moreover, M-B-W points to

no evidence indicating that Mr. Allen knew or should have known the materiality of the Mincher Patent to the Allen patents-in-suit.

In conclusion, the court finds that M-B-W has failed to show that an inference of deceptive intent is proper. Accordingly, the court finds that M-B-W has not met its burden of proof regarding inequitable conduct.

## D.    Litigation Misconduct

M-B-W's last argument for an exceptional case designation and an award of litigation costs and expenses relates to Allen's alleged litigation misconduct. M-B-W sets forth three specific claims to demonstrate that Allen's misconduct unnecessarily prolonged the proceedings and drove up the costs to the plaintiffs. First, it argues that Mr. Allen submitted an expert report which falsely stated that M-B-W trowels employed all the technology taught in some or all of the '660 and '833 patents, as well as omitted opinions on infringement of the '193 patent. (Pl.'s Mem. 21). Next, M-B-W asserts that Allen prolonged the proceedings by objecting and denying all Requests for Admissions. (Pl.'s Mem. 21-22). Lastly, M-B-W alerts the court that Allen was admonished for litigation misconduct in a previous case.

Among other things, where a patentee has exhibited "a strategy of vexatious activity" or has engaged in various discovery and trial abuses, a court may be warranted in a finding of litigation misconduct and an exceptional case designation under § 285. *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 (Fed. Cir. 1989); *see Phonometrics, Inc. v. Westin Hotel Co.,* 350 F.3d 1242, 1245-

46 (Fed. Cir. 2003). However, in this case, M-B-W has not sufficiently demonstrated that Allen engaged in questionable behavior as to justify the court in making such a finding. First, Mr. Allen's conclusions of infringement (and his omission of comments on the '193 patent) in his expert report do not appear to amount to misconduct. To begin, the expert report was issued in late October of 2008, only a month and a half before the parties jointly stipulated for dismissal of all claims. Therefore, the expert report does not appear to have prolonged the proceedings in any substantial way. Nor does M-B-W explain how the expert report increased its litigation expenses, other than by requiring it to serve a rebuttal expert report. In any event, M-B-W argues Mr. Allen made the assertions in his expert report after having been advised by his trial counsel in 2000 that the Allen patents-in-suit were limited to electric-over-hydraulic steering control and after he had inspected the accused trowels and parts manual. (Pl.'s Mem. 21). The court has already addressed the significance of the 2000 letter sent by Attorney Dykas in his representation of Multiquip to Allen – namely that it does not demonstrate Allen was on notice that certain of its patents' claims, relevant to this litigation, were limited to the electric-over-hydraulic type. It also appears that upon learning that Mr. Allen's conclusions in the expert report were incorrect, Allen decided to withdraw its infringement claims. Without more evidence of "litigation misconduct" the court refuses to hold Allen accountable for any deficiencies related to Mr. Allen's expert report, including the omission of any infringement opinion regarding the '193 patent.

The court is also far from convinced that Allen engaged in misconduct by objecting to and denying M-B-W's Requests for Admissions. The discovery requests sought admissions from Allen that the asserted and unasserted claims of the '833, '660 and '193 patents were not infringed by M-B-W. (Docket #152-1). Allen reasonably objected to each of these requests. First, Allen objected to the requests for admissions concerning the unasserted claims because they were irrelevant to the subject matter of the litigation. The court does not find these objections provide a ground for litigation misconduct. Second, the requests for admissions as to the asserted claims were objected to because Allen legitimately disputed the subject matter of the requests. Furthermore, Allen responded on July 28, 2008. This was before Allen learned the necessary information indicating its infringement position was incorrect. Accordingly, the court declines to find Allen engaged in litigation misconduct by objecting to ninety of M-B-W's requests for admissions. Lastly, the court is unpersuaded that Allen engaged in litigation misconduct in this lawsuit by M-B-W's reference to a previous case in which Allen's attorneys were "admonished" for their overzealous advocacy. *See Allen Engineering Corporation v. Bartell Industries, Inc.,* 299 F.3d 1336, 1356-57 (Fed. Cir. 2002). It appears that M-B-W cites this case in an attempt to prove a pattern of vexatious conduct. Yet, M-B-W has failed to demonstrate that Allen has engaged in any litigation misconduct in this lawsuit. Thus, even if the court were to afford weight to the Federal Circuit's

comments, there is still no proof that Allen has engaged in a *pattern* of vexatious litigation.

## CONCLUSION

The court concludes that M-B-W has not proven by clear and convincing evidence that Allen initiated and maintained a frivolous lawsuit, engaged in inequitable conduct before the PTO, or committed litigation misconduct. Therefore, the court does not find this case warrants either an exceptional case designation or an award of litigation costs and expenses including attorneys' and experts' fees.

Accordingly,

**IT IS ORDERED** that M-B-W's motion for attorneys' fees (Docket #149) be and the same is hereby **DENIED**; each party shall bear its own costs, expenses and attorneys' fees.

Dated at Milwaukee, Wisconsin, this 19th day of November, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge